# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 19-03084-09-CR-S-MDH** |
| | ) | |
| **CHANDLER B. ROBERTS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT & RECOMMENDATION OF U.S. MAGISTRATE JUDGE

Before the Court is the Motion to Suppress filed by Defendant Chandler B. Roberts. (Doc. 315.) Pursuant to 28 U.S.C. § 636(b) and Local Rule 72.1, this action was referred to the undersigned for preliminary review. Defendant moves to suppress as "evidence all items of alleged contraband and any incriminating statements made by [D]efendant relating to the nonconsensual, warrantless searches and seizures from [D]efendant's vehicle on January 23, 2018[,] and February 26, 2018." (Doc. 315.) The undersigned held an evidentiary hearing on the suppression issues on October 6, 2020. (Docs. 327 and 331.) Defendant was present with his attorney, Donald R. Cooley, and the Government was represented by Assistant United States Attorneys Jessica R. Sarff and Cameron A. Beaver. At the hearing, the Court heard testimony from Benjamin Lord, a detective with the Springfield Police Department (SPD) in the special investigations section, Jason Copley, an officer with SPD and a police service dog (PSD) handler with the Narcotics Enforcement Team (NET) at the time of the events at issue, Justin Goings, an officer with SPD who worked on patrol at the time of the events at issue, and Jerry Wine, a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). (Doc. 331 at

1

3, 32-33, 49, 71.)  For the reasons below, it is **RECOMMENDED** that Defendant's Motion to Suppress be **DENIED**.

## I.        Findings of Fact[1]

Prior to January 23, 2018, Det. Lord arranged three or four "controlled buys" from co-defendant Jeremy Ingram[2] using a confidential informant (CI), wherein the CI would buy methamphetamine from Ingram while officers conducted surveillance of the drug purchase.  *Id.* at 6-7, 12-13, 26-27.)  On one occasion, the CI introduced Det. Lord to Ingram, and Det. Lord personally bought methamphetamine directly from Ingram.  *Id.* at 27.  The CI was directed to notify Det. Lord if situations arose involving illegal activity.  *Id.* at 23.

On January 23, 2018, the CI notified Det. Lord that Defendant was at a residence located on North Summit Avenue, north of Kearney Street, in Springfield, Missouri, driving a white Chevy Cruze, and in possession of methamphetamine and a gun.  *Id.* at 5-6, 27-28.  Based on the CI's information, Det. Lord arrived within twenty minutes to conduct surveillance in the area, and he observed a white Chevy Cruze at the location as described by the CI.  *Id.* at 7.  Det. Lord also noted that a blue Mercedes belonging to Ingram was also present.  *Id.*  Defendant then left the area in the white Chevy Cruze, and Det. Lord followed in his vehicle, noting traffic violations[3] and conveying information of the vehicle's description and location and that Defendant was likely in possession of approximately half an ounce of methamphetamine and a firearm to law enforcement.  *Id.* at 8-9, 28, 34.  Since he was in an unmarked police vehicle and dressed in plain clothes, Det. Lord directed Officer Copley and two other law enforcement officers to conduct a traffic stop.  The

---

[1] The facts set forth are taken from the testimony adduced and the exhibit admitted, without objection, at the hearing on the Motion.  See Transcript (doc. 331) and Exhibit Index (doc. 328).
[2] Jeremy Ingram is also referred to as Drew Ingram in the record.  *Id.* at 73.
[3] Det. Lord testified that he did not recall what traffic violations he observed, and the record is unclear as to what traffic violations were committed by Defendant on January 23, 2018.  *Id.* at 28, 43.

2

officers performed a felony traffic stop on Defendant's vehicle, a tactic which Officer Copley explained is used by law enforcement when someone is suspected of being dangerous or carrying a firearm to separate the individual from the firearm. *Id.* at 8-9, 35. Officer Copley elaborated that two or three officers are typically involved in felony traffic stops; and where there is only one occupant in the vehicle, as in this case, some officers provide lethal cover should the suspect attempt to use the firearm, and commands are given to "shut off the vehicle, exit the vehicle slowly and in a controlled manner, [and] walk backwards to the officers" who are prepared to handcuff or detain the suspect. *Id.* at 43, 46-47. Here, once Defendant was placed in handcuffs, Officer Copley conducted a frisk of his person and told Defendant the traffic stop occurred because a stolen vehicle hit was acquired by his license plate. *Id.* at 36, 43, 47. Officer Copley employed the stolen vehicle ruse to protect the current investigation by not alerting Defendant that they received information he was in possession of methamphetamine and a gun and guide Defendant out of his vehicle, away from any firearm, in a controlled manner. *Id.*

Immediately thereafter, Officer Copley deployed his PSD "Rocky" onto Defendant's vehicle. *Id.* at 37. PSD Rocky received specialized training to alert narcotics such as cocaine, marijuana, methamphetamine, and heroin, and Officer Copley and PSD Rocky were certified together through the National Police Canine Association after approximately 200 hours of training. *Id.* Officer Copley deployed PSD Rocky counterclockwise around Defendant's vehicle, and PSD Rocky positively alerted by sitting down and staring toward the open window of the driver door. *Id.* at 38. Officer Copley deployed PSD Rocky around the vehicle a second time, and Rocky again positively alerted at the driver's window. Officer Copley returned PSD Rocky to his vehicle and informed Defendant that due to the positive alert he would search the vehicle for illegal narcotics. During the search, he discovered marijuana, methamphetamine in a Ziploc-style plastic bag, and

a semi-automatic Remington 750 compact rifle with nineteen rounds in the magazine and one .22 caliber round in the chamber, which was located in an open crate in the rear seat behind the driver's seat.[4]  *Id.* at 38-39, 45.  Defendant was informed of what was found in the vehicle, and he stated that "it wasn't right that [the officers] had searched it, and that he had felt like he was set up."  *Id.* 39-40.  Officer Copley advised Defendant not to incriminate himself, who then asked, "what does incriminate mean," to which Officer Copley responded that he did not want Defendant to say anything he does not want to say.  Defendant replied, "I know, I know, I'm not a bad guy, I'm just essentially a redneck from the sticks," and regarding the firearm, Defendant stated he had purchased the rifle days prior.  *Id.* at 40.  Officer Copley collected and logged all the items as evidence, and Defendant was taken to Greene County Jail.  *Id.* at 40, 72-73.

The next day, on January 24, 2018, SA Wine conducted an interview with Defendant.  *Id.* at 72-73.  Prior to the interview, Defendant was advised of his *Miranda* rights, and agreed to speak with SA Wine regarding the incident.  *Id.* at 73.  Defendant stated that the firearm and methamphetamine belonged to him, and that he obtained the methamphetamine from Ingram at Jennifer Tolbert's residence on the north side of Springfield near Summit Avenue and Kearney Street.  *Id.* at 74.  He further stated that he had purchased methamphetamine from Ingram on at least four different occasions at Tolbert's residence, he was a habitual user of methamphetamine for a couple of years, and that he had used marijuana since the age of twelve or thirteen.  *Id.* at 74, 78-79.  SA Wine advised him that as a habitual user of methamphetamine and marijuana, he was prohibited from possessing a firearm under federal law.  *Id.* at 79.

On February 26, 2018, SA Wine and the SPD Narcotics Unit conducted surveillance of Tolbert's residence.  *Id.* at 74.  Det. Lord received information from the same CI that Defendant

---

[4] The firearm involved in the January incident is referred to by several terms in the record: a "gun" (*id.* at 5,16, 23, 28), a "handgun" (*id.* at 9, 17, 18, 20), and a "rifle" (*id.* at 34, 35, 39, 44, 45).

was present again in the area of North Summit Avenue and Kearney Street with Megan McNary, who was known to have several outstanding warrants. *Id.* at 10-11. Det. Lord and SA Wine observed Ingram's vehicle and Defendant's vehicle—this time, his grandfather's white Ford truck—present at the location. *Id*. at 11, 75. Defendant left the area with Ingram, and SA Wine followed Defendant's vehicle, losing sight of the vehicle east on Kearney Street, but locating it soon afterwards at a gas station on Delaware and Kearney Street, with Ingram waiting in the passenger seat. *Id.* at 11, 76. Defendant then exited the gas station store, entered the white Ford truck, and returned to Tolbert's residence with Ingram. *Id.* at 76. After a few minutes inside, Defendant left with McNary in the passenger seat and drove to a Phillips 66 gas station at 2560 North Glenstone Avenue. (*Id.* at 11, 50, 76; doc 328, Exh. 1, 5:42:43-5:43:22.)

Due to McNary's outstanding warrants, SPD patrol officers were directed to stop Defendant's vehicle. (Doc. 331 at 11, 26, 51.) Officer Goings and another officer initiated the stop of Defendant's vehicle at the Phillips 66, and told Defendant that he would be on his way shortly. (*Id.* at 52; doc. 328, Exh. 1, 5:45:00-46:08.) After obtaining McNary's identifiers, Officer Goings relayed such to the police dispatcher and awaited confirmation of the existence of warrants for McNary. (Doc. 331 at 52.) In approximately twenty minutes, the dispatcher confirmed McNary's approximately seven warrants with multiple departments, during which time, Defendant denied officers consent to search the vehicle. *Id*. Following final confirmation of the warrants, McNary was arrested, and Defendant was told three times he was free to leave.[5] (*Id.* at 54; doc. 328, Exh. 1, 6:08:20-6:10:00.) Defendant then walked inside the gas station store and the three uniformed officers on scene returned to the area of the patrol car located directly behind

---

[5] The entirety of the stop to arrest McNary lasted approximately twenty-six minutes, with officers taking a few minutes to acquire McNary's identifiers at the start, approximately twenty minutes to confirm the warrants, and a few minutes at the end to search McNary's belongings before giving them to Defendant as requested. (*Id.* at 67-68; doc. 328, Exh. 1, 5:43:30-6:09:00.)

Defendant's vehicle at a gas pump.[6]  (Doc. 331 at 54; doc. 328, Exh. 1, 6:09:14-6:10:15.)  Det. Lord then informed Officer Goings that SA Wine would be arriving on scene to speak with Defendant (doc. 331 at 54-55, 62), and an officer near the patrol car is overheard on the dash camera video saying, "I already told him he is free to go . . . they better hurry up and get here." (Doc. 328, Exh. 1, 6:10:00-58.)

Having been parked across the street during the initial stop by SPD, SA Wine arrived on the scene in less than five minutes and engaged Defendant at the curb as he walked out of the store, between the Defendant's vehicle and the store front.  (Doc. 331 at 77, 80; doc 328, Exh. 1, 6:10:13-6:14:41) (less than five minutes pass between when officers return to their patrol car and when SA Wine and Defendant are observable on dash camera).  SA Wine asked if he could speak with Defendant, to which Defendant responded affirmatively.  (Doc. 331 at 86.)  SA Wine then told Defendant he suspected there were narcotics in Defendant's vehicle and that he had ordered a drug dog to respond to the scene.  *Id.* at 77-78, 87.  SA Wine testified that his suspicion was based on his prior interview with Defendant where he admitted purchasing narcotics from Ingram at Tolbert's residence, recent surveillance showing Defendant leave with Ingram then drop off Ingram at the same residence, which was indicative of a drug deal, and knowledge of at least two previous incidents with law enforcement where Defendant had methamphetamine and firearms. *Id.* at 77-78, 84.  Defendant denied having narcotics in his vehicle but admitted he had his grandfather's rifle.  *Id.* at 78.  SA Wine reminded Defendant that as a habitual user of methamphetamine and marijuana, he is not permitted to possess firearms, and therefore, SA Wine

---

[6] The dash camera's frame captures the Defendant's vehicle from behind and the area directly in front of the patrol car.  The patrol car's emergency lights are flashing for the entirety of the video, from the beginning of the stop to arrest McNary until the patrol car leaves.  (*See generally*, doc. 328, Exh. 1.)

could search the entire vehicle.[7]  *Id.* at 78-79.  Prior to SA Wine conducting the search, Defendant requested to speak with SA Wine and asked whether he was going to jail.  *Id.* at 79.  SA Wine responded that he would not take Defendant to jail if he was honest, and Defendant then admitted he had methamphetamine in his vehicle.  *Id.* at 79-80.  SA Wine located two bags of methamphetamine in the center console, a rifle, and ammunition for the rifle in Defendant's vehicle.  *Id.* at 80.  Defendant was not placed under arrest and permitted to leave the scene.  *Id.*

## II.    Conclusions of Law

### A.    Stop and Search of Defendant's Vehicle on January 23, 2018

Defendant raises several arguments for the suppression of evidence from the nonconsensual and warrantless search of Defendant's vehicle on January 23, 2018.  Specifically, Defendant challenges the reliability of the CI and claims the search incident to "a patently coordinated[,] bogus[,] and false stop, detention, and custodial arrest" was unlawful under the Fourth Amendment.  (Docs. 315 and 324.)  In response, the Government argues that probable cause supported the search of the vehicle because the CI's reliability had been established through prior controlled buys, and the specific, real time information provided was independently corroborated through law enforcement surveillance.  (Doc. 319.)  The Government also argues PSD Rocky's positive alert provided additional probable cause, and the automobile exception supported the search of the vehicle.  During the hearing, defense counsel clarified that the Motion does not raise any *Miranda* issues regarding Defendant's statements, stating that "the theory is that statements were taken pursuant to an unlawful detention."  (Doc. 331 at 2.)  The Court takes up the arguments below.

---

[7] SA Wine and Defendant can be seen on the dash camera video walking to the rear of Defendant's vehicle, presumably following discussion in front of the vehicle, and SA Wine then notifies SPD officers that a dog will be searching the vehicle and soon thereafter advises Defendant about being a habitual user in possession of a firearm.  (Doc 328, Exh. 1 at 6:14:37-6:16:15.)

The Fourth Amendment protects citizens "against unreasonable searches and seizures." U.S. Const. amend. IV; *United States v. Rowe*, 878 F.3d 623, 628 (8th Cir. 2017). Generally, evidence found because of an unlawful search or seizure, and the fruits therefrom, cannot be used against a defendant and must be suppressed. *United States v. Riesselman*, 646 F.3d 1072, 1078-79 (8th Cir. 2011). However, searches conducted pursuant to established and well-delineated exceptions do not require a warrant and are thus not unreasonable. *Arizona v. Gant*, 556 U.S. 332, 338 (2009). Of relevance, one exception to the warrant requirement allows for the warrantless search of automobiles if there is probable cause to believe the vehicle contains evidence of criminal activity. *See United States v. Brown*, 634 F.3d 435, 438 (8th Cir. 2011). Probable cause exists when, considering the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Scott*, 610 F.3d 1009, 1013 (8th Cir. 2010) (internal quotation marks and citations omitted). Additionally, probable cause for a stop and search of a vehicle may be based on the collective knowledge of all law enforcement officers involved in the investigation. *Rowe*, 878 F.3d at 628.

Here, the officers had probable cause to search Defendant's vehicle based on the information supplied by a reliable CI that Defendant was in possession of methamphetamine and a firearm. Officers may rely on an informant's tip to support a probable cause determination "if the informant has provided reliable information in the past or if his tip is independently corroborated." *Rowe*, 878 F.3d at 628. The CI relied on here had provided reliable information to Det. Lord by arranging three or four controlled buys of methamphetamine with Ingram prior to the January 2018 incident, including one occasion where Det. Lord purchased the methamphetamine directly from Ingram. Furthermore, on January 23, 2018, Det. Lord corroborated the CI's information that a white Chevy Cruze was at the specified location soon after receiving the tip.

*See United States v. Buchanan*, 574 F.3d. 554, 561-63 (8th Cir. 2009) (explaining that "[e]ven the corroboration of minor, innocent details can suffice to establish probable cause" (citation omitted)). This information was further corroborated because a blue Mercedes belonging to Ingram, a known drug dealer, was also present at the location. In other words, the CI had provided accurate and reliable information in the past *and* the tip was independently corroborated. Thus, the information provided furnished probable cause to stop and search Defendant's white Chevy Cruze under the automobile exception.

Even assuming, *arguendo*, that the CI's tip did not establish probable cause, it did provide a basis for reasonable, articulable suspicion to perform an investigatory stop. It is well-established that police officers are permitted to "conduct a brief, investigatory stop of an individual if the officer reasonably suspects that the individual is involved in criminal activity." *United States v. Lawhorn*, 735 F.3d 817, 820 (8th Cir. 2013). Law enforcement officers must have a "particularized and objective basis" for suspecting criminal activity, which "may be based on an informant's tip where the tip is both reliable and corroborated." *Id.* In determining whether law enforcement had reasonable suspicion to conduct an investigatory stop, courts examine the totality of the circumstances. *Id.* "An investigative detention may turn into an arrest if it lasts for an unreasonably long time or if officers use unreasonable force." *United States v. Donnelly*, 475 F.3d 946, 953 (8th Cir. 2007) (internal quotations marks and citation omitted). Therefore, "officers should employ the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose of the stop." *Id.* (internal quotation marks and citation omitted).

Here, law enforcement officers had sufficient reasonable suspicion to briefly stop and detain Defendant based on the information provided by Det. Lord. *United States v. Thomas*, 249

9

F.3d 725, 728 (8th Cir. 2001) ("[A]n officer may rely on information provided by other officers as well as any information known to the team of officers conducting the investigation."). As stated, a reliable CI notified Det. Lord that Defendant was at a residence on North Summit Avenue and Kearney Street, driving a white Chevy Cruze, and in possession of methamphetamine and a firearm. As well, Det Lord independently corroborated that the white Chevy Cruze was present at the residence and the presence of Ingram's vehicle in the same location provided additional corroboration that illicit drug activity was likely afoot. As a result, officers had reasonable, articulable suspicion to stop and detain Defendant.

That officers employed a "stolen vehicle ruse," a type of felony traffic stop, to separate Defendant from a possible firearm and protect ongoing investigations does not raise concern since officers may take measures "reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop," including brandishing weapons or using handcuffs. *United States v. Smith*, 648 F.3d 654, 659 (8th Cir. 2011) (citation omitted). Moreover, the totality of circumstances shows that officers "conduct[ed] a reasonably limited investigation to confirm or dispel [their] suspicion" that Defendant was in possession of methamphetamine and a firearm. *See United States v. Pelayo-Ruelas*, 345 F.3d 589, 593 (8th Cir. 2003). After Defendant was separated from his vehicle and frisked for weapons, Officer Copley deployed PSD Rocky around the vehicle immediately thereafter. *See United States v. Williams*, 429 F.3d 767, 772 (8th Cir. 2005) ("The use of the drug-sniffing dog on the exterior of a vehicle during a valid traffic stop does not infringe upon any Fourth Amendment rights." (citation omitted)). A dog sniff alert on a car or container gives a law enforcement officer probable cause to believe drugs are present. *Donnelly*, 475 F.3d at 955 ("Assuming that the dog is reliable, a dog sniff resulting in an alert on a container, car, or other item, standing alone, gives an officer probable cause to believe that there are drugs present.").

Here, PSD Rocky had appropriate training to alert to illegal narcotics, and during the exterior sniff of the vehicle, PSD Rocky twice alerted near the open window of the driver's door. The positive alerts gave Officer Copley probable cause to believe drugs were present and search the vehicle pursuant to the automobile exception of the warrant requirement. *See id.*

Because the stop and search of Defendant's vehicle on January 23, 2018, was conducted pursuant to a valid exception to the warrant requirement of the Fourth Amendment, the evidence obtained as a result of this search need not be suppressed as fruits of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 484-88 (1963) (explaining that under the fruit of the poisonous tree doctrine, the exclusionary rule bars the admission of evidence obtained directly or indirectly through the exploitation of police illegality). Here, there was no illegal police conduct at issue because, as discussed, the search of Defendant's vehicle was supported by probable cause and thus, lawful under the automobile exception. Accordingly, any evidence or incriminating statements derived as a result of the search of Defendant's vehicle, including Defendant's statements to Officer Copley at the scene and Defendant's *Mirandized* statements to SA Wine the following day need not be suppressed as fruits of the poisonous tree.

### B. Stop of Defendant's Vehicle on February 26, 2018

Defendant also challenges the nonconsensual and warrantless search of Defendant's vehicle on February 26, 2018. Specifically, Defendant argues he was unlawfully detained beyond the purpose of the stop to arrest McNary, and that following McNary's arrest, any questioning or detention of Defendant and the resultant search of his vehicle were unreasonable under the Fourth Amendment. In response, the Government contends that after McNary was arrested, Defendant was released, and that SA Wine's subsequent investigatory stop of Defendant was based on reasonable suspicion that Defendant was engaged in drug trafficking. As well, the Government

Case 6:19-cr-03084-MDH    Document 341    Filed 11/04/20    Page 11 of 16

argues that Defendant's spontaneous and voluntary admissions regarding his grandfather's rifle, and soon thereafter, the methamphetamine established probable cause to search the vehicle under the automobile exception. At the hearing, the Government argued in the alternative that SA Wine had probable cause to search the vehicle on February 26, 2018, based on his information about a possible firearm, his observations of Defendant and Ingram, and the information previously acquired during the investigation. (Doc. 331 at 91.)

### 1. Initial Stop and Arrest of Megan McNary

The evidence shows that the February 26, 2018 stop of Defendant's vehicle to arrest McNary, a passenger in the vehicle, was not unreasonably extended such that it was an unlawful detention of Defendant. In determining whether a detention is reasonable, courts look to the law enforcement purposes to be served by the stop, the time reasonably needed to effectuate such purposes, and whether the police diligently pursued such purposes. *See Williams v. Decker*, 767 F.3d 734, 741-42 (8th Cir. 2014). If prolonged beyond the time reasonably required to complete the purpose, a constitutionally permissible stop can become unlawful. *United States v. Williams*, 929 F.3d 539, 544 (8th Cir. 2019). While time is an important factor, courts have refused to establish rigid time limitations for investigative stops. *Decker*, 767 F.3d at 741-42.

Here, the purpose of the stop was to arrest McNary because she had several outstanding warrants. Defendant was detained for approximately twenty-six minutes, twenty minutes of which involved dispatch confirming McNary's seven warrants across multiple departments. *See United States v. Tuley*, 161 F.3d 513, 515 (8th Cir. 1999) (concluding that a detention that lasted for 20 minutes while an outstanding warrant was verified did not violate Fourth Amendment). Defendant was also told that he would be on his way shortly, and since he denied consent to search his vehicle, no search was performed at that time. Considering that the purpose of the stop was to arrest

McNary, the approximately twenty minutes to confirm McNary's identity and the existence of seven warrants in multiple departments was reasonable under the circumstances to effectuate that purpose. *See e.g., Rodriquez v. United States*, 575 U.S. 348, 353, 359 (finding that approximately twenty-two minutes to effectuate the traffic stop was reasonable but that extending the stop beyond its purpose without reasonable suspicion was improper); *United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005) (finding a forty-five minute detention, the majority of which was spent completing the traffic stop, reasonable under the circumstances); *United States v. Bloomfield*, 40 F.3d 910, 917 (8th Cir.1994) (holding a one-hour detention reasonable). Moreover, there is no evidence that the SPD officers unreasonably extended the stop for any reason unrelated to such purpose. In fact, following confirmation of the warrants, McNary was arrested, and Defendant was told he was free to leave on three occasions, but he chose instead to enter the gas station store. *See United States. v. Lozano*, 916 F.3d 726, 729 (8th Cir. 2019) ("[T]he Fourth Amendment prohibits only unreasonable seizures. A seizure occurs if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (internal quotation marks and citations omitted)). If Defendant was not free to leave, he would not have been permitted to enter the store, and there is no other evidence to suggest he was not free to leave. In the dash camera footage one officer even stated, "I already told him he is free to go," supporting the fact that Defendant was released. At that point, the stop to arrest McNary was already completed.

### 2. Second Stop and Search of Defendant's Vehicle

The subsequent encounter on February 26, 2018, between Defendant and SA Wine began consensually, but evolved into an investigatory stop based on reasonable, articulable, suspicion. "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has

'seized' that person" and the Fourth Amendment is implicated. *Terry v. Ohio*, 392 U.S. 1, 16 (1968). However, "[l]aw enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002). "Mere police questioning does not constitute a seizure, and so long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual." *United States v. Vera*, 457 F.3d 831, 834 (8th Cir. 2006) (internal quotations and marks omitted).

Here, the evidence shows that Defendant was not initially detained when he exited the store. The encounter between Defendant and SA Wine at the curb was cordial, calm, and consensual. However, once SA Wine notified Defendant that a drug dog was on its way because he suspected narcotics were in the vehicle, Defendant was detained. At that point, there were still three uniformed officers present and the patrol vehicle with its lights flashing parked behind Defendant's vehicle. Considering the totality of circumstances, no reasonable person would have felt free to disregard the ATF agent's statement that a drug dog was on its way, and simply drive away or go about his or her business. Thus, Defendant was detained; nevertheless, his Fourth Amendment rights were not violated.

SA Wine had reasonable, articulable suspicion that Defendant was involved in criminal activity and specifically, that there were narcotics in the vehicle. His suspicion was based on his prior interview with Defendant on January 24, 2018, where Defendant admitted purchasing narcotics from Ingram at Tolbert's residence on at least four occasions. Moreover, shortly before the encounter at the gas station, SA Wine conducted surveillance on Tolbert's residence and observed Defendant leave with Ingram, then drop off Ingram at the residence, which in his

14

experience was indicative of a drug deal. *See, e.g. United States v. Bustos-Torres,* 396 F.3d 935, 942-43 (8th Cir. 2005) (finding that the observation of a probable drug deal provided reasonable suspicion); *see United States. v. Roberts*, 787 F.3d 1204, 1209 (8th Cir. 2015) ("[O]fficers may draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them." (internal quotation marks and citation omitted)). Additionally, SA Wine had knowledge of at least two previous incidents where Defendant had methamphetamine and firearms. Given the abundance of information, there is no doubt that SA Wine had reasonable, articulable suspicion to stop and detain Defendant. In addition, the length of the encounter between SA Wine and Defendant was brief, lasting only about five minutes before SA Wine had probable cause to search the vehicle.

When SA Wine told Defendant that a drug dog was ordered because of suspected narcotics, Defendant then voluntarily stated that he did not have any narcotics but that he did have his grandfather's rifle. The statement does not trigger *Miranda* concerns because Defendant was not being interrogated. *United States. v. Londondio*, 420 F.3d 777, 783 (8th Cir. 2005) ("Voluntary statements that are not in response to interrogation are admissible with or without the giving of *Miranda* warnings."). In light of the admission, SA Wine had probable cause to search for the weapon because as a known, habitual drug user, Defendant is prohibited from possessing a firearm under federal law. 18 U.S.C. § 922(g)(3). Before SA Wine could search the vehicle for the rifle, Defendant requested to speak with SA Wine again, and Defendant then voluntarily admitted that he had methamphetamine in the vehicle. Given Defendant's voluntary admissions, SA Wine had probable cause to search the vehicle for the firearm and methamphetamine pursuant to the automobile exception. Furthermore, the evidence obtained from the stop and search of Defendant's vehicle on February 26, 2018, including Defendant's statements to SA Wine at the

scene, need not be suppressed as fruits of the poisonous tree. *See Wong Sun*, 371 U.S. at 484-88. As discussed, there was no illegal police conduct at issue, and the stop and search of Defendant's vehicle was supported by probable cause and lawful under the automobile exception. Accordingly, any evidence or incriminating statements derived as a result need not be suppressed as fruits of the poisonous tree.

### III.    Recommendation

Therefore, based on all the foregoing, and pursuant to 28 U.S.C. § 636(b) and Local Rule 72.1 of the United States District Court for the Western District of Missouri, the undersigned hereby **RECOMMEND**S that the Motion to Suppress (doc. 315) evidence of all contraband and incriminating statements made by Defendant from the warrantless searches and seizures of Defendant's vehicle on January 23, 2018, and February 26, 2018, be **DENIED**.

**IT IS SO ORDERED.**

  /s/ *David P. Rush*
DAVID P. RUSH
UNITED STATES MAGISTRATE JUDGE

DATE:  November 4, 2020

16